# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SPHERECOMMERCE, LLC (f/k/a
SPHERE ACQUISITION CO., LLC) and
SPHERE PAYMENTS, LLC,

    Plaintiffs,

  v.

ROBERT CAULFIELD and RMBBD
HOLDINGS, INC.,

    Defendants.

_____

ROBERT CAULFIELD and RMBBD
HOLDINGS, INC.,

    Counterclaim and
    Third Party Plaintiffs,

  v.

SPHERECOMMERCE, LLC (f/k/a
SPHERE ACQUISITION CO., LLC)
SPHERE PAYMENTS, LLC, WAUD
CAPITAL PARTNERS
MANAGEMENT IV, L.P.

    Counterclaim and
    Third Party Defendants.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

**C.A. No. 2021-0032-JRS**

## MEMORANDUM OPINION

Date Submitted: November 3, 2021
Date Decided: February 3, 2022

William M. Lafferty, Esquire, Kevin M. Coen, Esquire and Sarah P. Kaboly, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Timothy W. Knapp, P.C., Howard M. Kaplan, Esquire and Aleschia D. Hyde, Esquire of Kirkland & Ellis LLP, Chicago, Illinois, Attorneys for Plaintiffs/Counterclaim Defendants.

Tammy L. Mercer, Esquire and M. Paige Valeski, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware and Evan C. Borges, Esquire and Matthew S. Ingles, Esquire of Greenberg Gross LLP, Costa Mesa, California, Attorneys for Defendants and Counterclaim/Third Party Plaintiffs.

**SLIGHTS, Vice Chancellor**

Words have consequences. On August 25, 2020, Defendant, Robert Caulfield, gained unauthorized access to an all-employee virtual meeting of Plaintiff, Sphere Payments, LLC ("Sphere"). Using a fake screen name, he sent the following message to the more than 100 employees in attendance: "Except for our security officer, and Claudia trying, this executive group is a [expletive] joke. You are just fools playing office. It's depressing listening to you [expletive] dip[expletive]s." This colossal lapse of judgment has spawned the claims and counterclaims *sub judice.*

At the time he sent his message to Sphere employees, Caulfield, indirectly, was Sphere's largest individual equityholder and held a seat on its board of managers, which he filled with his proxy. Importantly, he was also subject to a Restrictive Covenant Agreement with Sphere that contained a non-disparagement clause. While non-disparagement clauses are routine in restrictive covenant agreements, and often are dismissed as surplusage by those who agree to be bound by them, they impose substantive restrictions, and they are enforceable.

In this case, Plaintiffs allege that Caulfield's material breach of the non-disparagement clause has placed him and his affiliated company, Defendant, RMBBD Holdings, Inc., in breach of other agreements with Sphere such that Sphere may, as a matter of right, "repurchase" RMBBD's Rollover Securities (as later defined) for fair market value as reasonably determined by Sphere's board of

1

managers (the "Board"). The Board has purported to exercise Sphere's repurchase rights and seeks, through its Verified Complaint ("Complaint"), declaratory judgments that it has lawfully done so.[1] Caulfield disagrees—hence the dispute.[2]

Caufield's troubles began in August 2017, when he sold 100% of his equity in TCPP, LLC ("TrustCommerce"), as held through RMBBD, to Plaintiff, SphereCommerce, LLC ("Buyer"), in exchange for over $118 million in base consideration. Following this transaction, TrustCommerce became a subsidiary of Buyer and an indirect subsidiary of Sphere. To consummate the sale, Caulfield, RMBBD and Buyer entered into a series of agreements, including a Restrictive Covenant Agreement (as to Caulfield) (the "RCA")[3] and a Securities Rollover Agreement (as to RMBBD) (the "Rollover Agreement").[4]

As a condition of the sale, RMBBD reinvested $20 million of the purchase proceeds back into Sphere, as required by the Rollover Agreement. In exchange for the reinvestment, RMBBD received substantial equity in Sphere (the "Rollover Securities"). The Rollover Agreement incorporated by reference certain provisions

---

[1] Pls.' Verified Compl. (D.I. 1) ("Compl.") ¶¶ 53–66.

[2] As discussed below, Caulfield has responded to the Complaint by filing a counterclaim consisting of 15 counts. *See* Caulfield Parties' Verified Countercls. and Third Party Compl. (D.I. 13) ("Counterclaim") ¶¶ 61–159.

[3] Ex. 1 to Opening Br. in Supp. of Pls./Countercl. and Third-Party Defs.' Partial Mot. to Dismiss Countercls. and Partial Mot. for J. on the Pleadings (D.I. 30) ("Sphere OB").

[4] Ex. 2 to Sphere Parties OB.

of Sphere's Amended and Restated Limited Liability Company Agreement (together with Amendment No. 1, the "LLC Agreement"), including provisions relating to Sphere's right to repurchase member units.[5] Subject to certain limitations, the Rollover Agreement provided that the repurchase rights outlined in Section 10.2 of the LLC Agreement would be triggered with respect to the Rollover Securities if Caulfield materially breached any of the restrictive covenants set forth in the RCA. As noted, Plaintiffs now maintain that Caulfield's rant to Sphere employees in August 2020 was a material breach of the RCA that has triggered Sphere's repurchase rights under the Rollover Agreement.

Buyer and Sphere (together, the "Sphere Parties") have moved to dismiss the counterclaims brought by Caulfield and RMBBD (the "Caulfield Parties"), all of which are premised on the notion that Caulfield did not materially breach the RCA. Relatedly, the Sphere Parties seek judgment on the pleadings with respect to their prayers for declaratory relief regarding the propriety of their repurchase of the RMBBD Rollover Securities. Reduced to their essence, the motions raise two issues: (1) whether the non-disparagement clause (as later defined) is a "restrictive covenant," the material breach of which would trigger repurchase rights under the Rollover Agreement; and (2) ) if the non-disparagement clause is a restrictive

---

[5] Ex. 3 to Sphere Parties OB.

3

covenant, whether the Court can determine on the pleadings that Caulfield materially breached the covenant.

For reasons explained below, I am satisfied the clear and unambiguous language of the RCA reveals that the non-disparagement clause was intended to be one of several restrictive covenants by which Caulfield agreed to be bound. I am not, however, satisfied that I may determine Caulfield *materially* breached that covenant as a matter of law on the pleadings. The motions, therefore, must be denied.

## I.  BACKGROUND

For purposes of the motion to dismiss, I accept as true the Counterclaim's well-pled factual allegations and draw all reasonable inferences in favor of the Caulfield Parties as the non-moving parties.[6] The related motion for partial judgment on the pleadings, as relevant here, is subject to the same deference to well-pled facts and the same caveat that all inferences to be drawn from those facts must be drawn in favor of the Caulfield Parties.[7]

---

[6] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[7] *Greenhouse v. Polychain Fund I LP*, 2019 WL 2290245, at *4 (Del. Ch. May 29, 2019) (quoting *W. Coast Mgmt. & Cap., LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006)).

## A. Parties and Relevant Non-Parties

Sphere is a software and financial technology company providing solutions that integrate payments and software to serve businesses of all sizes, from large, complex healthcare enterprises to merchants across a range of verticals, including transportation, education, and insurance.[8] Sphere is a Delaware LLC and its governing document is the LLC Agreement.[9] It is also a party to the Rollover Agreement with RMBBD.[10]

Buyer (SphereCommerce, LLC (f/k/a Sphere Acquisition Co., LLC)) is a Delaware LLC and a wholly owned subsidiary of Sphere formed to facilitate the acquisition of TrustCommerce.[11] It is a party to the RCA with Caulfield.[12]

Counterclaim Defendant, Waud Capital Partners Management IV, L.P. ("Waud"), is a middle-market private equity firm that focuses on acquiring companies in the healthcare services and business and technology services sectors.[13]

---

[8] Compl. ¶ 5.

[9] *Id.*

[10] *Id.*

[11] Compl. ¶ 6.

[12] *Id.*

[13] Counterclaim ¶ 19.

Waud is affiliated with Andrew Rueff and together they formed Buyer to facilitate the acquisition of TrustCommerce.[14]

Defendant, Caulfield, is the founder of TrustCommerce. He is a party to the RCA. Under the Rollover Agreement, Waud, as the majority shareholder of Sphere, appointed Caulfield as an additional manager on the Sphere Board.[15] By August 2020, the timeframe relevant here, Caulfield no longer served on the Board, having vacated his seat and appointed a proxy to serve in his stead.[16]

Defendant, RMBBD, is a California corporation formed by Caulfield to hold his interest in Sphere.[17] Caulfield serves as RMBBD's President.[18] RMBBD is a party to the Rollover Agreement.[19]

Non-party, TrustCommerce, is a California LLC and global leader in electronic payment processing and security.[20] In 2017, Buyer acquired

---

[14] Counterclaim ¶ 20.

[15] Compl. ¶ 8.

[16] Counterclaim ¶ 39.

[17] Counterclaim ¶ 8.

[18] Compl. ¶ 9.

[19] Counterclaim ¶ 8.

[20] Compl. ¶ 7.

TrustCommerce from the Caulfield Parties, after which TrustCommerce became a subsidiary of Buyer and an indirect subsidiary of Sphere.[21]

## B. The Relevant Contracts

In August 2017, the Caulfield Parties entered into a series of agreements to effect the sale of 100% of their equity interests in TrustCommerce to Buyer in exchange for more than $118 million in consideration.[22] These agreements included the RCA,[23] the Rollover Agreement,[24] and the LLC Agreement.[25] The Rollover Agreement governed the Caulfield Parties' contribution of units of TrustCommerce in exchange for "Rollover Securities," which were units of equity in Sphere.[26]

Central to this dispute is Section 6 of the RCA (the "Non-disparagement Clause"), which provides: "The Restricted Party hereby covenants and agrees not to, and to cause its Affiliates not to, at any time make negative comments or otherwise disparage Buyer, the Company or any of their officers, directors, employees,

---

[21] *Id.*

[22] Counterclaim ¶¶ 21, 22.

[23] Ex. 1 to Sphere OB.

[24] Ex. 2 to Sphere Parties OB.

[25] Ex. 3 to Sphere Parties OB.

[26] Compl. ¶ 14.

shareholders, agents or products."[27] The RCA defines "Restricted Party" as Robert Caulfield and "Company" as TrustCommerce (once sold).[28]

The RCA and LLC Agreement are explicitly referenced in the Rollover Agreement. Specifically, Section 5 of the Rollover Agreement provides that "[n]otwithstanding anything to the contrary in Section 10.2 of the LLC Agreement, the repurchase rights set forth in Section 10.2 of the LLC Agreement shall apply to the Rollover Securities only in the event that: (a) Robert Caulfield *materially* breaches any of the restrictive covenants set forth in the Restrictive Covenant Agreement during the longer of (i) the Restrictive Period (as defined in the RCA), or (ii) the Employment Term (as defined in the Employment Agreement) plus one (1) year after the end of the Employment Term[.]"[29] In the event the repurchase rights are triggered, the Rollover Agreement makes clear that:

---

[27] RCA § 6.

[28] RCA recitals.

[29] Rollover Agreement § 5 (emphasis by underline in original and by italics added). Section 10.2 of the LLC Agreement generally addresses the right of Sphere and Waud to repurchase Sphere units under certain designated circumstances, including in the event of a Management Unitholder's (to include Caulfield) "breach[] [of] any of the restrictive covenants, as determined by the Board in good faith, set forth in any agreement between such Management Unitholder and the LLC (Sphere) and any of its subsidiaries. . . ." LLC Agreement § 10.2(a)(iv). Significantly, as discussed below, Section 10.2(a)(iv) applies generally to Sphere units held by members and allows Sphere to exercise its repurchase rights with respect to such units held by a Management Unitholder upon a "breach" of a restrictive covenant by that unitholder. Section 5 of the Rollover Agreement, by contrast, applies only to the Rollover Securities held by RMBBD and provides for a right to repurchase those units only upon a "material breach" of the RCA by Caufield.

8

The repurchase provisions of Section 10.2(b) of the LLC Agreement shall apply to the Rollover Securities, except that the purchase price for the Rollover Securities shall be a price per unit equal to the Fair Market Value of such Rollover Securities as of the Repurchase Option Date. For the avoidance of doubt, this Section 5 shall in no way limit the Company's or any of its Affiliates' ability to recover damages related to a Restrictive Covenant Breach and further, Section 10.2(g) of the LLC Agreement shall not apply to such repurchase."[30]

## C. The Alleged Material Breach of the Non-disparagement Clause

On August 25, 2020, exactly three years after the RCA and Rollover Agreement were executed, Sphere held an all-employee meeting conducted over Zoom.[31] The meeting was password protected. [32] Caulfield was not then and is not now a Sphere employee, so he was not invited to the meeting.[33]

Near the end of the meeting, Sphere's CEO opened the floor for questions or comments to be submitted through the Zoom chat feature that was visible to all of the more than 100 employees in attendance.[34] In response to the call for questions or comments, the first posted chat message was addressed "to Everyone" at 2:49 p.m. ET from a person identified by the username "Its all the pandemic."[35]

---

[30] Rollover Agreement § 5.

[31] Compl. ¶ 23.

[32] *Id.*

[33] Compl. ¶ 24.

[34] Compl. ¶ 25.

[35] *Id.*

9

The message stated: "Except for our security officer, and Claudia trying, this executive group is a [expletive] joke. You are just fools playing office. It's depressing listening to you [expletive] dip[expletive]s" (the "Zoom Message").[36] A few days after the meeting, Sphere's Board confronted Caulfield about the Zoom Message and Caulfield "immediately informed the Board" that the message had come from him.[37] The Sphere Parties allege that the Zoom Message, sent by Caufield in the midst of an all-employee meeting, constituted a material breach of the Non-disparagement Clause.[38]

According to the Sphere Parties, after considering a valuation prepared by Duff & Phelps, and in light of Caulfield's conduct, the Board voted to exercise Sphere's repurchase rights under the Rollover Agreement during a Board meeting on November 2, 2020, with Caulfield's Board proxy in attendance.[39] Afterward, the Sphere Parties sent Caulfield a letter notifying him of Sphere's decision and attaching a subordinated note effecting the repurchase of the Rollover Securities for

---

[36] *Id.*

[37] Counterclaim ¶ 51.

[38] Compl. ¶ 63.

[39] Counterclaim ¶¶ 44–45.

$27.2 million, consistent with the Duff & Phelps valuation.[40]  Under Section 10.2(f) of the LLC Agreement, Caulfield was then issued a note to effect the repurchase.[41]

### D. Procedural History

The Sphere Parties filed their Complaint against the Caulfield Parties on January 13, 2021.[42]  The Complaint comprised two counts seeking declaratory judgments (one each as to Caulfield and RMBBD) regarding the propriety of the repurchase of the Rollover Securities, and one count asserting breach of contract against Caulfield for his breach of the RCA.  The Caulfield Parties responded by filing their answer and the Counterclaim, which comprise 15 counts ranging from requests for counter-declarations regarding the repurchase of the Rollover Securities to claims for breach of contract and conversion relating to the Sphere Parties' improper taking of the Rollover Securities.[43]  The Sphere Parties have moved to dismiss all counts of the Counterclaim (except those relating to the value of the

---

[40] *Id.*

[41] Compl. ¶ 50.  Caulfield alleges that by converting the Rollover Securities from equity to unsecured, subordinated debt, "the Sphere Parties have removed the Caulfield Parties' ability to share in the upside of any increase in Sphere's value, and instead put that upside directly into the Sphere Parties' pockets."  Counterclaim ¶ 55.  Caulfield's concern arises from the fact that the promissory note issued to RMBBD is subordinated not only to current senior debt but also any debt incurred by Sphere at any point in the future.  Counterclaim ¶ 133.

[42] D.I. 1.

[43] D.I. 13.

repurchased units) and for judgment on the pleadings for all counts of the Complaint except, again, for those relating to the value of the repurchased units.[44]

## II.  ANALYSIS

For the Sphere Parties' motions to be successful, the Court must answer two questions in the affirmative.[45]  First, is the Non-disparagement Clause a restrictive covenant as that term is used in the Rollover Agreement?  Second, was the Zoom Message a material breach of the Non-disparagement Clause?  "In answering these questions, the court must view the facts pleaded in the [C]omplaint [and Counterclaim] in the light most favorable to [the Caulfield Parties]."[46]

---

[44] D.I. 29.

[45] Both parties agree that regardless of whether the Court determines it can decide the breach of the RCA and related repurchase issues as a matter of law, the issue of whether the Sphere Parties have properly calculated the fair market value of the Rollover Securities is fact-intensive and cannot be decided on the pleadings.

[46] *Lillis v. AT&T Corp.*, 896 A.2d 871, 879 (Del. Ch. 2005); s*ee also MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *5 (Del. Ch. July 22, 2014) ("The procedural standard of review for a motion for judgment on the pleadings under Rule 12(c) is similar to that for a motion to dismiss under Rule 12(b)(6)."); *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) ("A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.") (citations omitted); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *5 (Del. Ch. Jan. 29, 2015) (holding that on a motion to dismiss under Rule 12(b)(6), the court takes well-pleaded factual allegations in the complaint as true, draws reasonable inferences in the light most favorable to the non-moving party and dismisses a claim only when the party bringing the claim could not "recover under any reasonably conceivable set of circumstances susceptible of proof") (quoting *Savor*, 812 A.2d at 896–977 (internal quotations marks omitted)).

## A. The Non-disparagement Clause Is a Restrictive Covenant

The threshold question presented by the competing requests for declaratory relief is whether the Non-disparagement Clause is a restrictive covenant that, if breached, would trigger the repurchase rights set forth in the Rollover Agreement. Not surprisingly, the Sphere Parties maintain that it unambiguously is, while the Caulfield Parties assert that it unambiguously is not.[47] Alternatively, the Caulfield Parties argue "the phrase 'restrictive covenant … is ambiguous, and discovery is necessary to resolve the ambiguity."[48]

"When analyzing a contract on a motion for judgment on the pleadings, this Court will grant such a motion only if the contract provisions at issue are unambiguous."[49] "Ambiguity does not exist simply because the parties disagree about what the contract means . . . . Rather, contracts are ambiguous when the provisions in controversy are reasonably or fairly susceptible of different

---

[47] Compl. ¶ 59; Sphere RB at 1–2; Caulfield AB at 26.

[48] Caulfield AB at 26.

[49] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2013 WL 5787958, at *4 (Del. Ch. Oct. 25, 2013); *see also GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at *5 (Del. Ch. Oct. 31, 2017) ("Judgment on the pleadings is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact.") (alteration in original) (quoting *Lillis v. AT & T Corp.*, 904 A.2d 325, 329 (Del. Ch. 2006)).

interpretations or may have two or more different meanings."[50] With this definition of ambiguity in mind, I am satisfied that the phrase "restrictive covenants set forth in the Restrictive Covenant Agreement," as it appears in the Rollover Agreement, is unambiguously unambiguous.[51]

"Delaware adheres to the objective theory of contracts, [meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[52] In making the determination of whether contract ambiguity exists, the court will "give effect to the plain meaning of the contract's terms and provisions,"[53] "will read a contract as a whole[,] and ... will give each provision and term effect, so as not to render any part of the contract mere surplusage."[54]

The phrase "restrictive covenants" is clear on its face. One need only go so far as a legal encyclopedia to understand that "'restrictive covenants' are restrictions

---

[50] *Cooper Tire & Rubber Co.*, 2013 WL 5787958, at *4 (quoting *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007)).

[51] Rollover Agreement § 5.

[52] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[53] *Id.* at 1159–60.

[54] *Id.* at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

arising out of agreements between private parties who can impose whatever lawful restrictions upon [each other] that they deem advantageous or desirable."[55]  In the RCA, Caufield agreed that his right to make "negative comments" about "the Company or any of their officers, directors, [or] employees" was restricted.[56]  In other words, he gave a restrictive covenant.

Reference to the dictionary yields similar clarity.  Broken down, "restrictive" means "serving or tending to restrict,"[57] while "covenant" means "formal and serious agreement or promise."[58]  Taken together, a "restrictive covenant" is a promise to restrict, in this case, to restrict one's behavior.  Viewed through this lens, the Non-disparagement Clause fits the definition like a glove.  Again, it reflects a promise to restrict oneself from "mak[ing] negative comments or otherwise disparag[ing] Buyer, the Company or any of their officers, directors, employees, shareholders, agents or products."[59]  As is typical with restrictive covenants, the Non-

---

[55] *See* 20 Am. Jr. 2d *Covenants* §148 (Jan. 2022 Update).

[56] RCA § 6.

[57] *See* https://www.merriam-webster.com/dictionary/restrictive (last visited Jan. 31, 2022).

[58] *See* https://www.merriam-webster.com/dictionary/covenant (last visited Jan. 31, 2022); *see also Lorillard Tobacco Co. v. Amer. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) (noting that "Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract . . . because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the meaning of [undefined] words . . . in the contract.").

[59] RCA § 6.

disparagement Clause appears among several other promised restrictions within the RCA.[60] Each are restrictive covenants, and a material breach of any would trigger the Sphere Parties' repurchase rights under the Rollover Agreement.

## B. The Material Breach Determination Is Not Conducive to Judgment on the Pleadings

Having concluded that the Non-disparagement Clause is a restrictive covenant within the RCA, I turn next to the Sphere Parties' contention that Caulfield's Zoom Message constitutes a material breach of the Non-disparagement Clause such that their right to repurchase the Rollover Securities was activated as a matter of law.[61] To be clear, unlike the LLC Agreement, where the repurchase right is conditioned, *inter alia*, upon a *breach* of any applicable restrictive covenants, the Rollover Agreement expressly, and presumably intentionally, conditions the repurchase right upon a showing that Caulfield *materially breached* a restrictive covenant, in this case the Non-disparagement Clause.[62]

---

[60] *See, e.g.*, RCA § 1 (non-competition); RCA § 2 (non-solicitation of employees); RCA § 3 (non-solicitation business of relationships); RCA § 4 (non-disclosure of confidential information); RCA § 6 (non-disparagement). *Accord AG Res. Hldgs., LLC v. Terral*, 2021 WL 486831, at *1 (Del. Ch. Feb. 10, 2021) (observing that "the Employment Agreement, at Sections 7(a)–(e), lays out its own *set of restrictive covenants*, including a non-competition provision, a non-solicitation provision, *a non-disparagement provision*, a non-interference provision and an agreement not to share confidential information, as defined in the agreement.") (emphasis supplied).

[61] Sphere OB at 15; Rollover Agreement § 5.

[62] *Compare* LLC Agreement § 10.2(a)(iv) with Rollover Agreement § 5.

At first glance, it is difficult to see Caulfield's Zoom Message as anything but a material breach of the Non-disparagement Clause. After all, that covenant sets the disparagement bar quite low by restricting Caulfield from making "negative comments" about the officers and directors of the Company.[63] The only reasonable characterization of even the tamest portion of the Zoom Message—exclaiming that the Sphere executives "are just fools playing office"—is that Caulfield made a "negative comment" about the Company's management team. If a *clear* breach of the Non-disparagement Clause were all that was required, the Sphere Parties would prevail on their motions with little fanfare. But the *material* breach inquiry is more nuanced.[64]

As a matter of common law, "[a] breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."[65]

---

[63] RCA § 6; Compl. ¶ 39.

[64] *See* Restatement (Second) of Contracts § 241, cmt. a (1981) (observing that the determination of whether a breach is material "is necessarily imprecise and flexible").

[65] *Mrs. Fields Brand, Inc. v. Interbake Foods, LLC*, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017). I note that the material breach inquiry typically is implicated when determining whether a party to a contract is excused from performing that contract. *See, e.g., id.* (finding after trial that party had failed to prove a material breach of contract that would justify non-performance); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *98 (Del. Ch. Nov. 30, 2020) (same); *BioLife Sol., Inc. v. Endocare, Inc.*, 838 A.2d 268, 281 (Del. Ch. 2003) (same). It is far less common to see "material breach" utilized as a standard by which to assess whether other contractual rights have been triggered. Indeed, none of the cases cited by the parties engage in a material breach analysis

17

"Under this doctrine, whether a breach is material 'is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'"[66]

Section 2411 of the Restatement (Second) of Contracts provides five factors that are useful when determining whether a breach is material. They are:

> (i) the extent to which the injured party will be deprived of the benefit which he reasonably expected, (ii) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived, (iii) the extent to which the party failing to perform or to offer to perform will suffer forfeiture, (iv) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances, and (v) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[67]

The Sphere Parties focus on the first consideration, "the extent to which the injured party will be deprived of the benefit which he reasonably expected."[68] According to the Sphere Parties, having bargained for the Non-disparagement clause, they "reasonably expected not to be defamed and upbraided by Caulfield before the entire assembled workforce. [And], [b]ased on Section 5 of the [Rollover

---

in this context. It is also noteworthy that each of the cases cited above considered the fact-intensive material breach question after a full trial on the merits.

[66] *AB Stable VIII LLC,* 2020 WL 7024929, at *98.

[67] *Id.* (quoting Restatement (Second) of Contracts § 241 (1981) (internal quotations omitted)).

[68] Sphere RB at 14.

Agreement], the Sphere Parties reasonably expected that, if they were, they would have the recourse of repurchase of his units at a fair market price."[69]

While the Sphere Parties' characterization of the effects of Caulfield's conduct may well prevail on a more developed record, the material breach analysis implicates a more searching inquiry before reaching that conclusion. For instance, it appears from the pled facts that Sphere's employees did not know who authored the Zoom Message at the time it was sent.[70] If that is borne out in the evidence, that might affect the fact-finder's determination of whether the disparagement was material.[71] In other words, "negative comments" from an anonymous sender may have a different impact on Sphere employees and, by extension, on the Sphere

---

[69] Sphere RB at 14–15.

[70] Counterclaim ¶ 51; Compl. ¶ 28 (stating that Caulfield "concealed his identity" before posting the Zoom Message). Indeed, it does not appear that Caulfield revealed that he was the author of the Zoom Message "until he was confronted on November 2, 2020, by Sphere's Board." *Id.*

[71] *See* Restatement (Second) of Contracts § 241, cmt. b (1981) (observing that "the *extent to which* the injured party will be deprived of the benefit he reasonably expected from the exchange" is relevant when determining whether a breach is material) (emphasis added); *AB Stable VIII LLC,* 2020 WL 7024929, at *98 (holding that a "weighing of the consequences" of the breach is appropriate when engaging in the material breach analysis); *BioLife Sol., Inc. v. Endocare, Inc.,* 838 A.2d 268, 281 (Del. Ch. 2003) (noting that a breach may have given rise to a damages claim, but it did not give rise to a material breach claim); *Beacon Assocs., Inc. v. Apprio, Inc.,* 308 F. Supp. 3d 277, 286 (D.D.C. 2018) (noting that a breach was not material, in part, because the monetary harm associated with the breach was insignificant compared to the value of the contract).

Parties than "negative comments" from the founder of one of Sphere's subsidiaries.[72]

On the other hand, the evidence may reveal that the Zoom Message materially deprived the Sphere Parties "of the benefit which [they] reasonably expected" from the RCA either because the impact of the statement was significant in the minds of the hearers (including employees and management) regardless of the source, or because the hearers knew or discovered the source well before the Sphere Parties disclosed that it was Caulfield.[73]

The Court is also encouraged to consider "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived," and "the extent to which the party failing to perform or to offer to perform will suffer forfeiture."[74]  Caulfield argues that the harm flowing from the breach of the Non-disparagement Clause, if any, can readily be compensated in damages, and that the Sphere Parties' exercise of the repurchase rights in the Rollover Agreement

---

[72] *Cf.* 17A Am. Jur. 2d, *Contracts* § 547 (Jan. 2022 Update) (noting that the extent of damage can be a factor in determining the materiality of breach); Samuel Williston & Richard A. Lord, *Williston on Contracts*, § 63:3 (4th ed. 1990) (noting that "where a breach causes no damages or prejudice to the other party, it may be deemed not to be 'material'").

[73] In this regard, harm need not be purely financial harm to be material.  For instance, the Zoom Message may be proven to have had a negative impact on employee morale, employee willingness to follow the direction set by management, or some other internally disruptive consequence.  That all remains to be seen in the evidence.

[74] Restatement (Second) of Contracts § 241.

20

has resulted in a forfeiture of his Rollover Securities.[75]   Again, these are fact-intensive considerations that, to the extent relevant in the non-repudiation context, cannot be resolved on the pleadings.

## C. The Remaining Claims

As noted, the Sphere Parties have moved to dismiss the Counterclaim counts that do not turn on the extent to which the Board properly calculated the fair market value of the Rollover Securities.  Each of these arguments for dismissal rest on the assumption that the repurchase right in the Rollover Agreement was triggered as a matter of contract and, therefore, as a matter of law.[76]   Because the Court cannot determine on the pleadings whether Caulfield materially breached the Non-disparagement Clause, the Court cannot yet determine whether the repurchase right was trigged.  If the Sphere Parties possessed a right to repurchase, then there was no conversion and no breach of contract.[77]   If they did not, then the conversion and breach claims may be viable.  For now, the claims cannot be dismissed on the

---

[75] Caulfield RB at 38–39.

[76] Sphere OB at 15; Sphere RB at 18–19.

[77] There can be no conversion or breach of contract if the taking of the Rollover Shares was authorized by contract.  See *Gould v. Gould*, 2012 WL 3291850, at \*7 (Del. Ch. Aug. 14, 2012) (reciting elements of conversion).

pleadings because, until the material breach issue is decided, the allegations that the repurchase right was not triggered must be accepted as true.[78]

## III. CONCLUSION

For the foregoing reasons, the Sphere Parties' Motion to Dismiss and Motion for Judgement on the Pleadings must be DENIED.

**IT IS SO ORDERED.**

---

[78] Counterclaim ¶¶ 66–105.